FROM V A Med Ctr DIRECTORS OFC                (WED)DEC 12 2007 11:41/ST.11:40/No.7500955039 P 2

0733700644

personal service

DISTRICT COURT OF SHAWNEE COUNTY KANSAS
200 East 7th
Topeka, Kansas  66603
Division 12
Chapter 60

Case Number 07C 001672

EITAN SOBEL MD
Plaintiff 1

          VS.

COLMERY-O'NEIL VA MEDICAL CENTER
Defendant 1

SUMMONS

To the above named Defendant,
You are hereby notified that an action has been commenced against you in this court. If you wish to dispute the claim, you are required to file your answer to the Petition with the court and serve a copy upon:

EITAN SOBEL MD
2205 PORTSIDE LN

OSAGE BEACH,  MO   65065
Attorney for Plaintiff 1

Within thirty (30) days of service upon you. If you fail to do so, judgment by default will be taken against you for the relief demanded in the Petition. Any related claim which you may have against the plaintiff must be stated as a counter claim in your answer, or you will be barred from making such claim in any other action.

Dated 3 December, 2007

```
------------------------------
      Official
Seal of the District Court
  Shawnee County, Kansas
   29 January   MDCCCLXI
------------------------------
```
                                                    Angela M. Callahan
                                               Clerk of the District Court

                                                    By ZFPFJYXAS7
                                                      Deputy Clerk

0733700644 CJM   PG 1

IN THE THIRD JUDICAL DISTRICT
SHAWNEE COUNTY, KANSAS

FILED BY CLERK
K.S. DISTRICT COURT
THIRD JUDICIAL DIST.
TOPEKA, KS.

2007 DEC 3 AM 10 20

Date: November 28, 2007

Eiran Sobel, MD
2205 Portside LN
Osage Beach, MO 65065

Vs                                      Pro-Se Case number  07C1672

Colmery-O'Neil VA Medical Center
2200 Gage Blvd
Topeka, KS 66622

## PETITION

The plaintiff in the above-captioned matter is filling this petition as a Pro-Se case, requesting the court to instruct the defendant to reverse its conclusions and its reporting to the National Provider Database (NPDB) DCN # 5500000047263179 which held the plaintiff as the responsible practitioner for the death of a 79 year old patient (H.P 3254).

Unfortunately, the manner in which the investigation was done was purely arrogant and unfair. The said conclusions are based on wrong facts and inadequate review of the medical records. And furthermore, the investigating panel of Colmery-O'Neil VA Medical Center never obtained eyewitness testimony.

The plaintiff is seeking new employment and said reporting to the National Provider Database is causing him significant damage to his future employment prospects and to his future career.

### BACKGROUND:
In 2003, the plaintiff was an employed physician at Colmery-O'Neil VA Medical Center. On November 18, 2003 the plaintiff was called to the Intensive Care Unit (ICU) to do a consult on one of his patients, Ms. H.P 3254. The patient was malnourished with history of alcohol abuse and some dementia, which had an esophageal stricture. An esophageal dilatation that was done by another physician (a gastroenterolog) was complicated by esophageal rupture. She than underwent surgery to repair her esophagus and was cared for in the Intensive Care Unit at the Colmery-O'Neil VA Medical Center. When the plaintiff was called for a consultation, seven days after the surgery, the issue was severe malnutrition, as the patient, who was malnourished before the surgery, did not receive any significant nutrition since the surgery. Total Parenteral Nutrition (TPN) via intravenous route was recommended by the nutritionist and was ordered by the surgeon, Dr. Krishna. TPN is usually provided via a central line, a line placed at the great blood vessels of the neck and upper chest. This is done at the bedside. Prior to the procedure the plaintiff obtained a formal consent from the patient. The plaintiff was well familiar with the patient and her family. The patient had some form of dementia like many other patients at this age but was perfectly capable of understanding and making medical decisions. In fact, the plaintiff had already consulted the psychiatry service of Colmery-O'Neil VA Medical Center, and they declared the patient as mentally capable of making her own medical decisions. A formal consultation is available in the medical records of this patient.
During her hospital admission, the patient made her own medical decisions, sometimes against the advise of the medical doctors and sometimes despite the objection of her family and her daughter.

The process of obtaining the informed consent was according to the usual medical practice. A detailed explanation was provided to the patient prior to the procedure, including the benefits and risks of the procedure. The nurse caring for the patient, Joan Carls RN, was directly involved in the obtaining consent and witnessed it. The nurse knew the patient very well as she took care of her for several days in the ICU. She also felt that the patient understood the risks, including death, and benefits of the procedure and willingly agreed to the procedure.

Unfortunately, the procedure did not go well. Although the plaintiff has had an extensive experience in placing central lines and the procedure was performed correctly, the patient suddenly gasped for air and died a few minutes later. There was no good immediate explanation for her death. In addition, the plaintiff could not attempt to resuscitate the patient as the patient signed a Do Not Resuscitate (DNR) order.

The plaintiff knew the family and he met them after the patient's death. The family expected the patient to die and was not at all surprised to hear the new about her death. The plaintiff had the integrity to tell them the truth that unfortunately, the death happened as a result of the procedure. The plaintiff was very much interested in getting a post mortem evaluation, as he was puzzled and disturbed by the patient's death. Initially the family refused the autopsy as they did not see the point in getting an autopsy but later they agreed to it.

The post mortem exam showed that the tip of the guide wire has perforated the heart muscle. This is a very unusual complication and could neither be predicted nor prevented by the plaintiff.

The plaintiff met again with the family. This time the meeting was done in the office of the medical director, Dr. Courtney. The atmosphere was much more suspicious and every word that was said in the room was recorded in writing by the daughter. The county coroner who performed the autopsy was there and it was his opinion that this complication was very unusual and could not have been prevented or predicted. By the end of the meeting, the family refused to shake the hand of the plaintiff. However, the medical director, Dr. Courtney, reassured him that "everything was done right" and shook his hand.

The family sued the VA Medical Center, and under federal tort laws, despite the plaintiff's objection, the VA Medical Center settled the case for $125,000 (a sum of money that could go along way toward helping deserved veterans).

The VA Medical Center internal investigation named the plaintiff, Eitan Sobel, MD, the responsible provider for this patient's death. They reported the case to the National Provider Database (NPDB) DCN # 5500000047263 17.

From this point on, the plaintiff, Eitan Sobel MD, must report this occurrence in every application to any hospital were he is requesting privileges, job offer, state medical license, board application, training agencies and malpractice insurance agencies.

### THE PLAINTIFF'S RIGHT TO DEFEND HIMSELF AND THE PRIVACY ACT of 1974

a) The plaintiff was not given the opportunity to review the allegations against him or to review the "expert opinion" or other relevant documents of this case.

b) A settlement was paid to the family of the patient despite the plaintiff's objection

c) In 2005, the plaintiff was given an opportunity to review the medical record for two hours but was not allowed to make any copies.

d) The plaintiff was given the opportunity to write a general statement about the case, which he did.

e) A pear panel investigation team was created and concluded that the plaintiff was the responsible provider for the patient's death

f) When the plaintiff received in 2007 the panel's conclusions (four years after the occurrence), he immediately disputed their conclusions by a letter to John Grippi of the VA administration.

g) Since the conclusions were sent to the National Provider Database (NPDB), the plaintiff filed a dispute with the Secretary of the US Department of Health and Human Services regarding the alleged malpractice conclusions of the VA Medical center. The plaintiff was asked to provide pertinent documentations to support his position (Item # 1).

h) Unfortunately, the plaintiff is not able to provide those documentations because his access to the medical record of his patient is blocked by the VA medical center. The VA Medical center responded that under the privacy law of 1974, they couldn't disclose the medical record of the patient to the plaintiff, Eitan Sobel, MD. (Item # 2)

i) The plaintiff argued that by suing the VA Medical Center, the family of the patient was perfectly willing to disclose the details of the case to the public, and therefore, there is no reason to block his access to the records.

j) Interestingly, a previous letter from the reviewing panel, dating May 23 2007 (item #3,4,5 and 6), that was sent to the plaintiff via mail, mentions the name of the patient and important medical information of the patient (marked off with thick black ink). Go figure out the confidentiality policies - VA style.

k) The plaintiff approached a Federal Judge to subpoena the necessary documents and testimonies, but was told by the clerk that without an open court case he would not be able to get a subpoena.

l) As a last resort, the plaintiff called the daughter of the patient, asking her to allow him access to her mother's medical records. She never returned any of his messages. She is probably convinced by now that an incompetent physician, the plaintiff, had killed her mother.

m) At this point, the plaintiff has no other alternative to resolve the issue except for filing this petition.

**RESPONSE TO THE REVIEWING PANEL of the VETERAN ADMINISTRATION.**

The reviewing panel made multiple serious factual errors, incorrect claims and arrogant statements that have no scientific basis. (Please review Item # 7)

a) The panel claims that the surgical team were not involved in the decision to initiate TPN (Item # 7 line 6). However, this claim is factual incorrect. If one reviews the medical records, he would find a direct order from the surgeon, Dr. Krishna, to start TPN that day. Furthermore, a nutritionist was involved in the case and recommended TPN.

b) The panel claims that prealbumin was not measured (Item # 7 line 8). This is an arrogant claim as no lab test is required to determine severe malnutrition in a severely underweight patient who had no meaningful nutrition for 7 days after a major surgery and who was malnourished prior to the surgery for years because of esophageal stricture and alcoholism. Moreover, the panel acknowledges in prior page that the patient was malnourished (Item # 8).

c) The panel suggested that a PICC line should be contemplated prior to central line (Item # 7 line 8). This is again an unfounded and arrogant claim. Unfortunately in this malnourished patient with poor peripheral veins, PICC line was not a good option. In addition, there is no solid data in the medical literature to suggest that a PICC lines are any better or safer than a central lines. Most physicians are using central lines rather than PICC lines for hospitalized inpatients, while PICC lines are usually used in outpatient settings. In addition, medical studies show more complications with PICC lines than with central lines (attached few medical references Item # 9, 10, 11 and 12). Interestingly, PICC lines are also prone to cause perforations of the heart walls (Item # 13)

d) The Panel stated that there was no informed consent (Item # 8 line 10). This is probably the most serious allegation, but unfortunately, this claim is factually incorrect. The patient signed an informed consent and the actual document is available in the patient's medical records. In addition, the plaintiff documented the process of obtaining an informed consent in his procedure note and probably the nurse's, Joan Carlson, wrote a note as well. After explaining to the patient the risks (including death) and benefits of the procedure the patient signed her name on the consent form in her own handwriting. Discreditably, crucial documentation was overlooked.

e) Furthermore, the panel neglected to obtain a valuable testimony of the nurse, Joan Carlson, RN, who was directly involved in obtaining the consent and performing the procedure. The nurse remembers that the patient demonstrated good understanding of the procedure, the indications, the risks and the benefits. This is an important testimony as this nurse was involved in this patient's care for several days prior to her death.

f) The Panel noted that the patient had dementia (Item # 8 line 11), related to her age and alcohol abuse (Item # 14). In fact, most of the elderly patients demonstrate some degree of dementia but they are perfectly competent to make their own decisions. As stated above, the plaintiff had already established that the patient's competency to make here own decisions, as the psychiatric service of the VA Medical Center had evaluated the patient and declared her as mentally capable to make her own medical decisions. In addition throughout her admissions, the patient had made her own decisions, sometimes against medical advice and despite the objection of her family. Again there is a factual error as the psychiatric service consult, patient's actions and testimonial facts of the plaintiff and the nurse involved were overlooked and ignored.

g) Regarding not involving the family (Item # 8 line 11). It is generally true, that for major surgeries, physicians like to get the family involved prior to a surgery, even if the patient is medically competent to make his or her own decisions. However, for most minor procedures that are done at the bedside, most physicians would not plan the procedure or time it according to the family presence. Therefore, families rarely get involved in minor procedures. Placing a central line is a minor procedure and is rarely delayed until the family arrives to the hospital.

h) Regarding the last statements that there is "no immediate need for TPN" (Item # 8 line 13). The plaintiff respectfully disagrees. This was a case of severely malnourished patient who had no meaningful nutrition for seven days post operatively as well as prior to the operation. She was extremely malnourished prior to the last surgery. Despite the long battle between the supporters of enteral feeding (EN) (orally or via gastric or intestinal feeding tube) and the supporters of intravenous feeding (TPN), there is really no contradiction between the two means. In fact, the two complement each other, especially in this type of malnourished patient who had inadequate gastrointestinal function. (see Item # 17) Even if a patient was starting eating after prolongs starvation, her expected oral intake would not be sufficient and additional intravenous nutrition was required. Since no oral feeding was given at that time for a long period, it was important to initiate intravenous nutrition. Moreover, the fact is that the surgeon, Dr. Krishna, thought that TPN is indicated and ordered it and TPN was recommended by the nutritionists as well. The plaintiff rejects this last statement of the panel as ridiculous, detached from real life patient care, not supported by medical science (Item # 17) and particularly arrogant.

**RESPONSE TO THE ALLIGATION STATED IN THE NATIONAL PROVIDER DATABASE (NPDB)**

a) "Without proper consent" (Item # 15 line 1) - was already addressed in the paragraph above in sections d, e and f.

b) "Negligently inserted a central line for parental nutrition, causing the patient complications" (Item # 15 line 1 and 2). The plaintiff refers to Item # 16 in which the panel described the initial complication of failing to canalize the vein. The panel states that the plaintiff had appropriately responded to the first complication by compression. Obviously, there was no neglect in the fashion in which the central line was inserted. The perforation of the heart by the guide wire is unexpected complication that cannot be detected during the procedure and can be discovered during an autopsy. An important testimony of the coroner who performed the autopsy and participated in the meeting with the family after the autopsy was not obtained. According to the coroner testimony during the meeting, there was no way that the plaintiff could have predicted or prevented this complication. In addition, the opinion of Dr. Courtney, the medical director at that time, was not obtained. The medical director stated in the meeting that he feels that appropriate care was delivered to the patient and correct central line insertion technique was applied by the plaintiff according to the standard of medical care.

c) Regarding the "cause of death" (Item # 15 line 3 and 4). The plaintiff is very sorry for the death of his patient, but the patient died as a result of her most significant disease - her severe malnutrition. Her malnutrition made her heart wall so thin, fragile and delicate that the tip of the guide wire of the central line easily perforated it.

d) The plaintiff had provided a dedicated and conscientious care for this patient throughout her admission. He relentlessly tried to save this patient from her death during her prolong hospital course. The plaintiff treated the patient and her family as if they were his own family. The plaintiff demonstrated the appropriate integrity, and ethics expected from a medical professional and had the patient's best interest in his heart.

**THE CLAIMS AGAINST THE VA MEDICAL CENTER**

b) The plaintiff argues that the VA medical center investigation of the case was incomplete, had multiple serious factual errors and was corrupted with arrogance.

c) The plaintiff argues that important testimonies were not included. The plaintiff's statement was not accepted or even considered and the plaintiff could not argue his case in person or respond to the "expert opinion". The testimony from the nurse involved in the case, Joan Carlson, RN, and other eyewitness testimonies from individuals in the Intensive Care Unit were not obtained. The case was dragged for four years without giving the plaintiff a fair opportunity to defend himself. It seems that the governing bodies and individuals of the VA administration and their legal department do not believe that physicians hired by the Veteran Administration system could provide quality care and the input provided by the physician, the plaintiff, simply did not count. Instead, "an expert opinion" was sought, which would provided the administration what they expect to hear, that the care provided in the VA system was substandard.

d) The plaintiff argues that the VA medical center pear panel investigation was unfair to the plaintiff and it was constructed to support the mediocre, inefficient and apathetic governing bodies and individuals of the VA administration to justify their sloppy settlement payments.

e) The plaintiff argues that the VA medical center investigation is using the privacy laws and confidentiality policies to prevent the plaintiff from defending himself.

### THE PETITION TO THE DISTRICT COURT

The plaintiff is a hard working hospitalist (House physician), who has been in practice since 1987. The plaintiff is caring for about 12 to 16 patients a day throughout the year, providing excellent and much needed care to numerous patients.

There is no reason why his chances to get a new job, license or malpractice insurance should be affected by this unfortunate case. The plaintiff maintains that he acted correctly and he should be able to present a clean personal malpractice record.

Unfortunately, the plaintiff had to report this case to several agencies and to prospective employers.

The plaintiff state that much damage was already done by the VA medical Center investigation and some of this damage may not be reversible.

The plaintiff demands that the VA medical center will act immediately and would do whatever possible to correct this injustice.

Signature _____
Name:    Eitan Sobel, MD
Address: 2205 Portside LN
         Osage Beach, MO 65065
Phone:   (573) 348-2397

SUBSCRIBED AND SWORN TO, before me, a public notary, or deputy clerk this __29__ day of __NOVEMBER 2007__

> DEBBIE ROSE HILL
> Notary Public - Notary Seal
> STATE OF MISSOURI
> Camden County – Comm.#05401733
> My Commission Expires Sept. 27, 2009

Debbie Rose Hill
DEBBIE ROSE HILL
NOTARY PUBLIC

### SERVICE INSTRUCTIONS

I hereby request that the defendant Colmery-O'Neil VA Medical Center at address 2200 Gage Blvd Topeka, KS 66622, be served with summons to be served by the sheriff of Shawnee County personally or by certified mail.