IN THE UNITED STATES OF AMERICA DISTRICT COURT
FOR THE DISTRICT OF KANSAS

**FILED**
APR - 4 2008
Clerk, U.S. District Court
By: _____ Deputy Clerk

Date: Friday, April 04, 2008

Eitan Sobel, MD

Vs                                    US Court Case number 5:08-cv-4001-SAC (pro se)

United States of America

## AMENDED PETITION

The plaintiff in the above-captioned matter is filling this petition as a pro-se case, requesting the court to instruct the defendant to remove its reporting to the National Provider Database (NPDB) DCN # 5500000047263179 which held the plaintiff as the responsible practitioner for the death of a 79 year old patient (H.P 3254). This petition is an amendment to the original petition filed on 1/3/2008. This amend petition was re-written based on the Federal Tort Claims Act (FTCA) claiming negligent acts of agents of the United States have resulted in significant future monetary damages and income losses, which could be avoided by the removal of the report.

**BACKGROUND:**
In 2003, the plaintiff was an employed physician at Colmery-O'Neil VA Medical Center. On November 18, 2003 the plaintiff was called to the Intensive Care Unit (ICU) to do a consult on one of his patients, Ms. H.P 3254. The patient was malnourished with history of alcohol abuse and some dementia, which had an esophageal stricture. An esophageal dilatation that was done by another physician (a gastroenterolog) was complicated by esophageal rupture. She than underwent surgery to repair her esophagus and was cared for in the Intensive Care Unit at the Colmery-O'Neil VA Medical Center. When the plaintiff was called for a consultation, seven days after the surgery, the issue was severe malnutrition, as the patient, who was malnourished before the surgery, did not receive any significant nutrition since the surgery. Total Parenteral Nutrition (TPN) via intravenous route was recommended by the nutritionist and was ordered by the surgeon, Dr. Krishna. TPN is usually provided via a central line, a line placed at the great blood vessels of the neck and upper chest. This is done at the bedside. Prior to the procedure the plaintiff obtained a formal consent from the patient. The plaintiff was well familiar with the patient and her family. The patient had some form of dementia like many other patients at this age but was perfectly capable of understanding and making medical decisions. In fact, the plaintiff had already consulted the psychiatry service of Colmery-O'Neil VA Medical Center, and they declared the patient as mentally capable of making her own medical decisions. A formal consultation is available in the medical records of this patient.
During her hospital admission, the patient made her own medical decisions, sometimes against the advise of the medical doctors and sometimes despite the objection of her family and her daughter.
The process of obtaining the informed consent was according to the usual medical practice. A detailed explanation was provided to the patient prior to the procedure, including the benefits and risks of the procedure. The nurse caring for the patient, Joan Carls RN, was directly involved in the obtaining consent and witnessed it. The nurse knew the patient very well as she took care of her for several days in the ICU. She also felt that the patient understood the risks, including death, and benefits of the procedure and willingly agreed to the procedure.
Unfortunately, the procedure did not go well. Although the plaintiff has had an extensive experience in placing central lines and the procedure was performed correctly, the patient suddenly gasped for air and died a few minutes later. There was no good immediate explanation for her death. In addition, the plaintiff could not attempt to resuscitate the patient as the patient signed a Do Not Resuscitate (DNR) order.
The plaintiff knew the family and he met them after the patient's death. The family expected the patient to die and was not at all surprised to hear the new about her death. The plaintiff had the integrity to tell them

the truth that unfortunately, the death happened as a result of the procedure. The plaintiff was very much interested in getting a post mortem evaluation, as he was puzzled and disturbed by the patient's death. Initially the family refused the autopsy as they did not see the point in getting an autopsy but later they agreed to it.
The post mortem exam showed that the tip of the guide wire has perforated the heart muscle. This is a very unusual complication and could neither be predicted nor prevented by the plaintiff.

The plaintiff met again with the family. This time the meeting was done in the office of the medical director, Dr. Courtney. The atmosphere was much more suspicious and every word that was said in the room was recorded in writing by the daughter. The county coroner who performed the autopsy was there and it was his opinion that this complication was very unusual and could not have been prevented or predicted. By the end of the meeting, the family refused to shake the hand of the plaintiff. However, the medical director, Dr. Courtney, reassured him that "everything was done right" and shook his hand.

The family sued the VA Medical Center, and under federal tort laws, despite the plaintiff's objection, the VA Medical Center settled the case for $125,000 (a sum of money that could go along way toward helping deserved vetererans).

The VA Medical Center internal investigation named the plaintiff, Eitan Sobel, MD, the responsible provider for this patient's death. They reported the case to the National Provider Database (NPDB) DCN # 550000004726317.

From this point on, the plaintiff, Eitan Sobel MD, must report this occurrence in every application to any hospital were he is requesting privileges, job offer, state medical license application, board application, training agencies and malpractice insurance agencies.

## THE PLAINTIFF'S RIGHT TO DEFEND HIMSELF AND THE PRIVACY ACT of 1974

a) The plaintiff was not given the opportunity to review the allegations against him or to review the "expert opinion" or other relevant documents of this case.

b) A settlement was paid to the family of the patient despite the plaintiff's objection

c) In 2005, the plaintiff was given an opportunity to review the medical records for two hours but was not allowed to make any copies.

d) The plaintiff was given the opportunity to write a general statement about the case, which he did.

e) A pear panel investigation team was created and concluded that the plaintiff was the responsible provider for the patient's death

f) When the plaintiff received in 2007 the panel's conclusions (four years after the occurrence), he immediately disputed their conclusions by a letter to John Grippi, MD of the VA administration.

g) Since the conclusions were sent to the National Provider Database (NPDB), the plaintiff filed a dispute with the Secretary of the US Department of Health and Human Services regarding the alleged malpractice conclusions of the VA Medical center. The plaintiff was asked to provide pertinent documentations to support his position.

h) Unfortunately, the plaintiff is not able to provide those documentations because his access to the medical record of his patient is blocked by the VA medical center. The VA Medical center responded that under the privacy law of 1974, they couldn't disclose the medical record of the patient to the plaintiff, Eitan Sobel, MD.

i) The plaintiff argued that by suing the VA Medical Center, the family of the patient was perfectly willing to disclose the details of the case to the public, and therefore, there is no reason to block his access to the records.

j) Interestingly, a previous letters from the reviewing panel, dating May 23 2007 that was sent to the plaintiff via mail, mentions the name of the patient and important medical information of the patient - Go figure out the confidentiality policies - VA style.

k) The plaintiff approached a Federal Judge to subpoena the necessary documents and testimonies, but was told by the clerk that without an open court case he would not be able to get a subpoena.

l) As a last resort, the plaintiff called the daughter of the patient, asking her to allow him access to her mother's medical records. She never returned any of his messages. She is probably convinced by now that an incompetent physician, the plaintiff, had killed her mother.

m) At this point, the plaintiff has no other alternative to resolve the issue except for filing this petition.

## THE CLAIM AGAINST THE UNITED STATES OF AMERICA.

The plaintiff is filing this petition based on the Federal Tort Claims Act (FTCA) claiming negligent acts of agents of the United States of America have resulted in significant future monetary damages and future income losses, which could be avoided by the removal of the report.

The death of the patient H.P 3254 was investigated by a peer review committee. One would expect a professional peer review members to be thorough, fair, unbiased and objective in their investigation and decisions. Based on those professional expectations, the law provides certain immunity to decisions made by peer review committees even if those decisions are wrong.

This immunity limitations was defined by the supreme court in the case of Berkovitz v. United States, 486 U.S. 531, 108 S.Ct. 1959 (1988) The immunity is provides when the United States' agent must apply judgment and/or choice and there are no federal statutes, agency regulations, or policies directive which imposes mandatory duties upon the federal agency or the employee. Then the agency or the employee will have to exercise discretion.

The law, however, does not provide immunity to pure negligence, poor performance, indolence and indifference of federal agents. The law expects federal employees who have the power to make "discretionary function" to be responsible and sincere. The plaintiff asks the court to differentiate "discretionary function" from pure negligence that could not and should not be excused or justified under the Federal Tort Claims Act (FTCA). Therefore, although the plaintiff does not agree with the arbitrary decisions and misinterpretations of medical literature made by the committee, those could be portrayed as "discretionary function" of the peer review members. Instead, the plaintiff would focus on factual errors that represent unequivocal negligence on the part of the committee members.

The members of the peer review did not work at Colmery-O'Neil VA Medical Center or in the general area of the hospital and therefore, are not familiar with the conditions and the procedures of this specific hospital. One should wonder if the physicians of the peer review committee who probably work at the central offices of the Veteran Administration could serve as peer reviewers without intimate knowledge of the specific hospital.
Regardless, the basis of any unbiased and objective determination should be based at least on the facts as documented in the medical records. It is a basic expectation that each peer review member would independently review the medical records. The plaintiff claim that the medical records and the facts surrounding the case were not properly reviewed by the committee members as they are wrongly stated by all the committee members over and over again. Obviously, the members of the committee never bothered to investigate the plaintiff's statements in 2005 or to get further direct testimony from the nurse involved in the case, Joan Carlson, RN.

The Medical Legal affair committee memorandum dated May 7, 2007 states in section 4 the conclusions and rationale for their decision. It is stated, "there is no inform consent in the medical records". The "lack" of informed consent is a central issue in the case against the plaintiff, but unfortunately, this statement is simply not true. A consent form signed by the patient is available in the medical records. Furthermore, the process of obtaining informed consent is described in the medical records in the original plaintiff's note on 11/18/2003. Later on, in 2005 the plaintiff was given an opportunity to review the patient's medical records and he confirmed the presence of the informed consent in the medical records. In addition, the plaintiff's statement to the committee in 2005 describes the process of obtaining the informed consent and the presence of the consent in the medical records. In fact, the plaintiff could obtain a testimony that the consent was still present in the medical records as of November 2007. In addition, the events prior to the procedure are still well remembered by the nurse, Joan Carlson, RN, and were probably documented by her as well.

In 2007, after receiving the conclusions and rationale of the committee, the plaintiff disputed the conclusions of the peer review committee. The fact that an informed consent was legally obtained and signed by the patient and is available in the medical records was communicated to John B. Grippi, MD. Despite the plaintiff's efforts to correct the peer review committee's factual error, a "re-review" of the committee dated August 22, 2007 stated again the same factual error in paragraph 2:

> "The panel again determined that the rational for the initial conclusion has not changed. Specifically, the panel noted that there was no informed consent in the medical record and there was no documented discussion with the nutritionist or surgical team about alternative routes of oral nutrition."

The plaintiff asserts that the factual error regarding the signed consent was repeatedly stated by the peer review committee. This factual error could not and should be dismissed as overlook or oversight by the peer review committee but rather viewed as a gross negligence. It is expected that an "objective reviewers" would check the facts of the matter brought to their judgment. After all, one would not expect "an objective reviewer" to be a rubberstamp to previous reviewers. Still, oversight or innocent errors could happen. However in this case, the plaintiff repeatedly asked the committee to check again the facts of this matter, and yet, nothing was done. Unfortunately, this factual error is the foundation of the peer review conclusions and this error discredit their conclusion as crucial documentation was overlooked. Therefore, those actions could not and should not be dismissed as oversight or innocent errors but rather, as carelessness, indolence and indifference – in short, negligence.

This factual error regarding the consent is not the only problem with the panel conclusions, but it is certainly the most important one. In fact, the committee ignored and did not address many other facts that potentially could have changed their decision. It further strengthens the plaintiff's claim that the medical records were not properly reviewed by each of the panel member.

a) The committee did not address the fact that the surgeon wrote an order to initiate intravenous feeding and to get the nutritionist consultation regarding intravenous feeding. This fact could change their perception regarding the communication between the surgeon, the internist (the plaintiff), the dietitian and the nurse as there was communication and an agreement among the providers to start intravenous feeding.

b) The committee ignores the fact that there was an attempt to orally feed the patient and it was felt to be unsafe and therefore, a NPO (Nothing by mouth) order was written by the surgeon. This fact could change their questions whether oral route of feeding was ever considered.

c) The committee did not address the fact that the patient was declared competent to make her own decisions by the psychiatry service of the Colmery-O'Neil VA Medical Center. This fact could change their perception about the role of the family when performing minor bedside procedures.

d) The committee did not address the low weight of this patient in relation to her height. Those facts are well documented and could give the committee members a sense of how severe was this patient's malnutrition state, and why intravenous feeding was absolutely necessary.

e) The committee did not address the fact that the patient did not have any meaningful nutrition for more than a week after the emergency operation by the surgical team. Should the postoperative course have been properly reviewed by the committee members, then those facts could influence the final decision of the committee.

In conclusion, the repeated error of "not finding" the informed consent in the medical records, with the additional support from other facts that were not mentioned nor addressed by the committee, implies that the committee members received their information from a third party source which supposedly reviewed the medical records. Otherwise, it is hard to understand how this main factual error was repeated by each committee member at least twice. If this were the case, then one would wonder whether the conclusions of the committee members are also derived from the same third party source. Regardless of the mechanism of the error, the fact is that the work of the panel was negligent and therefore should be discarded and rejected.

## THE DEMAGES

The plaintiff would have significant monetary damage from the negligent report to the National Provider Database (NPDB) DCN # 5500000047263179 which held the plaintiff as the responsible practitioner for the death of a 79-year-old patient (H.P 3254). The monetary damages include:
    a. Future out of pocket expenses for liability insurance.
    b. Future loss of income.
    c. Future damage to the plaintiff's reputation.

However, the significant future monetary damages and income losses could be avoided by the removal of the report. The plaintiff is asking the court to instruct the Veteran Administration to remove its report from the National Provider Database (NPDB) DCN # 5500000047263179.

Future damages:
    a. Liability insurance costs would increase as a result of increased number of reports to the NPDB. Some insurance companies may just refuse to insure physicians with previous NPDB reports. The premium costs may increase by $10,000, $20,000 per year or even more. For the next 20 years, an increase in cost of $10,000 would result in $200,000 loss and by converting future losses to their present value at 5% interest the current monetary compensation would be $122,782.

    b. Loss of future income: historically, the plaintiff had changed jobs every three years and the report may delay his chances to get a new job, medical licenses, hospital privileges and even block his chances to get a new job. If one assumes a minimum of three months delay every three years for the next 20 years then the damage would be, at minimum, twenty five percent of the plaintiff's yearly salary $320,000/4 = $80,000. This would be multiplied by seven future transitions and would result in $560,000 losses and by converting future losses to their present value at 5% interest, the current monetary compensation would be $343,791. On the other hand if the report would block the plaintiff's chances to get a job for the next 20 years then the monetary damage could reach 6.4 million dollars and by converting future losses to their present value at 5% interest, the current monetary compensation would be 3.9 million dollars.

The plaintiff maintains again that most of future monetary damages and income losses could be avoided by the removal of the report immediately.

**THE REQUESTED REMEDY**
The plaintiff is seeking the removal of the negligent report to the National Provider Database (NPDB) DCN # 550000004726317.

The plaintiff is a hard working hospitalist (Hospital physician), who has been in practice since 1987. The plaintiff is caring for about 12 to 20 patients a day throughout the year, providing excellent and much needed care to numerous patients.
The plaintiff maintains that he provided appropriate and conscientious and care to his patient H.P. 3254 as if she was a member of his own family. The plaintiff acted responsibly within the acceptable practice of medicine. There is no reason why his chances to get a new job, license or malpractice insurance should be affected by this unfortunate case. The plaintiff should be able to present a clean personal malpractice record. Unfortunately, the plaintiff had to report this case to several agencies and to prospective employers. The plaintiff state that damage was already done by the Veteran Administration investigation and some of it may not be reversible.
The plaintiff is asking that the Veteran Administration will act immediately and remove the negligent report to the National Provider Database (NPDB) DCN # 550000004726317.

Signature _____
Name: Eitan Sobel, MD
Address: 2205 Portside LN
Osage Beach, MO 65065
Phone: (573) 348-2397

SUBSCRIBED AND SWORN TO, before me, a public notary, or deputy clerk this 4th day of April 2008

State of Missouri
County of Camden
On this 4th day of April, 2008, before me personally appeared Eitan Sobel, MD to me known to be the person described in and who executed the foregoing instrument and acknowledged that he executed the same as his free act and deed
IN WITHNESS WHEREOF, I have hereunto set may hand and affixed my official seal in the county of Camden, state of Missouri, the day and year first above written.

Kathy C Bates
Notary Public

My commission expires:

*NOTARY SEAL*
Kathy C. Bates, Notary Public
Camden County, State of Missouri
My Commission Expires 3/16/2010
Commission Number 06482347

**CERTIFICATE OF SERVICE**

I hereby certify on April 4, 2008, I filed the forgoing AMENDED PETITION with the clerk of the United States court by fax. I further certify that I service the forgoing documents by registered mail to the following participant:

1) Office of the Attorney General, Washington, D.D.
2) United State Attorney, Topeka KS
3) Secretary of Veteran Affairs

Signature _____
Name:    Eitan Sobel, MD
Address: 2205 Portside LN
         Osage Beach, MO 65065
Phone:   (573) 348-2397